KENNETH W. DONNELLY (LEAD TRIAL ATTORNEY)
(DC Bar No. 462996)
donnellyk@sec.gov
D. ASHLEY DOLAN
dolanda@sec.gov
HEATHER A. POWELL
powellh@sec.gov
SARAH M. HALL
halls@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549-5949
Telephone: (202) 551-4946 (Donnelly)
Facsimile:  (202) 772-9292 (Donnelly)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>JEAN DANHONG CHEN, TONY JIANYUN YE, KAI HAO ROBINSON, KUANSHENG CHEN, LAW OFFICES OF JEAN D. CHEN, A PROFESSIONAL CORPORATION, TREE LINED HOLDINGS, LLC, and GOLDEN STATE REGIONAL CENTER, LLC,<br><br>                    Defendants. | Case No.  3:18-cv-06371-LB<br><br>**FIRST AMENDED COMPLAINT**<br><br>Judge: Honorable Laurel Beeler |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**SUMMARY OF THE ACTION**

1.       This case involves fraud, self-dealing, and unregistered brokerage activity in violation of the federal securities laws.  Defendants Attorney Jean Chen ("Chen"), her law firm, Law Offices of Jean D. Chen (the "Law Offices"), and her then-husband, Tony Ye ("Ye"), were

paid over $12 million in undisclosed commissions to sell securities to their legal clients in offerings under the federal EB-5 Immigrant Investor Program.  They attempted to conceal their unlawful activity with the help of Defendant Kuansheng Chen ("Kuansheng Chen"), who provided an off-shore bank account to receive the transaction-based compensation and posed as the head of a Beijing immigration agency that was actually co-owned and controlled by Chen and Ye.

2.    To reap additional profits under the EB-5 Immigrant Investor Program, Chen and Ye also covertly acquired and operated Defendant Golden State Regional Center, LLC ("Golden State"), an approved EB-5 regional center.  They facilitated their legal clients' investments in the center without disclosing to those clients or any other investors that they managed and controlled it or were involved in the development of certain of its projects, along with their company, Defendant Tree Lined Holdings, LLC ("Tree Lined").  Defendant Kai Robinson ("Robinson") aided and abetted this fraud by posing as the sole manager in control of Golden State when, in fact, she was merely a figurehead controlled by Chen and Ye.

3.    When Defendants became aware of the SEC's investigation, they engaged in a cover-up operation, which included, among other things, refusing to produce documents, manufacturing exculpatory evidence, deleting volumes of evidence, and scrubbing additional records in an attempt to obfuscate their involvement in the schemes.

4.    On March 7, 2019, Chen and Ye were indicted on charges of visa fraud, obstruction of justice, aggravated identity theft and, for Ye only, identity theft.  On May 5, 2021, Ye pled guilty to counts in a superseding indictment charging him with conspiracy to defraud the United States and obstruction of justice (in part, including obstruction of the SEC's investigation).

5.    By their conduct, Defendants have violated and/or aided and abetted violations of, the antifraud and registration provisions of the federal securities laws.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

6.    The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa].  Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the

mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

7.     Venue is proper in this district under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because, at the time of the filing of the original Complaint (Dkt. 1), Defendants Law Offices, Tree Lined, and Golden State had their principal place of business in this district.  Because Kuansheng Chen is not a resident of the United States, venue is proper in any district court.

8.     Under Civil Local Rule 3-2, this civil action should be assigned to the San Francisco Division.  A substantial part of the events or omissions which give rise to the claims occurred in Alameda, Sonoma, and San Francisco Counties, where the Bay Area I property is located, the Bay Area II property is located, and the Law Offices had an office.

## DEFENDANTS

9.     **Jean Danhong Chen**, age 56, resided in Atherton, California at the time of filing the original Complaint (Dkt. 1) and is now believed to reside in China.  She was the managing partner of the Law Offices of Jean D. Chen, a California law firm.  She was admitted to practice law in New York in 1998.  There is no information to indicate that she has ever been admitted to practice law in California.  Chen fled the United States the day following the filing of the original Complaint and has not returned since.  Thereafter, she became a naturalized citizen of Dominica in or about October 2018 under the name Maria Sofia Taylor.

10.    **Tony Jianyun Ye**, age 53, resides in Atherton, California.  He was employed by the Law Offices of Jean D. Chen as Office Manager beginning in 2007.  Ye and Chen were married from 2002 until mid-2017.  On information and belief, Chen and Ye continued to live together following their divorce, which was unknown to many, until Chen left the United States.

11.    **Kai Hao Robinson**, age 48, resides in Emeryville, California.  She claims to be the sole owner and manager of Golden State Regional Center, LLC.  She has been a certified public accountant licensed in California since 2016.

12.     **Kuansheng Chen**, age 64, resides in Beijing and Hong Kong, China.  He is either a family friend or relative of Chen.  He claims to be Managing Director of U.S. Immigration Services of Beijing New Horizons Investment Consulting Co., Ltd., a China-based entity controlled by Chen and Ye.

13.     **Law Offices of Jean D. Chen, A Professional Corporation** was incorporated in California in 2007 and had its principal place of business in San Jose, California.  Chen was the sole partner and principal of the firm, which specialized in immigration law.  In or around July 2018, Chen and Ye began to operate the law firm under the name Mission Pacific Global Law Group.

14.     **Tree Lined Holdings, LLC (f/k/a Tree Lined Properties, LLC)** a California limited liability company, was organized in 2012 and has its principal place of business in San Jose, California.  Tree Lined specializes in real estate development.  At all relevant times, Tree Lined was solely owned by Ye and Chen.

15.     **Golden State Regional Center, LLC** a California limited liability company, was organized in 2012 and at all relevant times had its principal place of business in San Jose, California.  It was acquired and was managed and controlled at all relevant times by Chen and Ye.

### RELEVANT ENTITIES

16.     **Beijing New Horizons Investment Consulting Co., Ltd. ("New Horizons")** is or was a company with its principal place of business in Beijing, China.  At all relevant times, New Horizons purported to provide immigration services to residents of China.  At all relevant times, it was owned, in part, by Chen and Ye.

17.     **Summit International Services Limited ("Summit International")** is or was a company with its principal place of business in Hong Kong, China.  At all relevant times, Summit International was a subagent of New Horizons.

18.     **Atlantic Immigration International Group, Ltd ("Atlantic Immigration")** is or was a company with its principal place of business in Hong Kong, China.  At all relevant times, Atlantic Immigration was a subagent of New Horizons.

19.     **Bay Area Investment Fund I, LLC ("Bay Area I")** a California limited liability company, was organized in 2012 and at all relevant times had its principal place of business in San Jose, California.  Golden State was and remains the manager of Bay Area I.

20.     **Bay Area Investment Fund II, LLC ("Bay Area II")** a California limited liability company, was organized in 2012 and at all relevant times had its principal place of business in San Jose, California.  Golden State was and remains the manager of Bay Area II.

21.     **Fremont Hills Development Corporation ("Fremont Hills")** a California corporation, was incorporated in 2014 and has its principal place of business in San Jose, California. Fremont Hills is the job creating entity and developer for the Bay Area I EB-5 Project.

22.     **Kawana Meadows Development, LLC ("Kawana Meadows")** a California limited liability company, was organized in 2016 and has its principal place of business in Newark, California.  Kawana Meadows was formerly Kawana Meadows Development Corporation, a California corporation incorporated in 2015.  Kawana Meadows is the job creating entity and developer for the Bay Area II EB-5 Project.

## FACTS

### A.     The EB-5 Immigrant Investor Program

23.     The United States Citizenship and Immigration Services ("USCIS") administers the EB-5 Immigrant Investor Program, created by Congress in 1992 to stimulate the U.S. economy through job creation and capital investment by foreign investors.  The program sets aside EB-5 visas for participants who invest in commercial enterprises approved by USCIS, sometimes administered by entities called "regional centers."

24.     EB-5 regional center investment vehicles are typically offered as limited partnership interests or limited liability company units, which are managed by a person or entity other than the foreign investor, who acts as a general partner or managing member of the investment vehicle.  To become a regional center, the entity must demonstrate, with supporting economic and statistical studies, how it will promote economic growth, including job creation.

25.     To be eligible for an EB-5 visa through a regional center, a foreign investor must invest at least $500,000, putting this money at risk for the purpose of generating a return.  The

investor may then petition USCIS for conditional permanent residency for a two-year period through an application called an I-526 petition.  If at least ten U.S. jobs are created as a result of the foreign investor's investment, the investor may apply to have the conditions removed from his or her visa and live and work in the United States permanently.

26.     As reflected in the offering documents at issue, the limited partnership interests or limited liability company units purchased by investors are an investment of money, in a common enterprise, with the expectation of profits derived solely through the efforts of others.  The relevant offering documents state that the investments were being offered pursuant to exemptions from the registration requirements of the federal securities laws, and certain of those documents describe the investments as "securities."

27.     Statutory authorization for the EB-5 Immigrant Investor Regional Center Program ended on June 30, 2021.  As of December 30, 2021, Congress has not enacted new legislation authorizing the regional center program.  As a result, USCIS is reevaluating the decision to hold, or not act on, any pending petition or application that is dependent on the expired statutory authority and was filed before the end of the statutory authorization.

**B.     Chen and the Law Offices Served as Legal Counsel for EB-5 Investors**

28.     The Law Offices was a law firm specializing in immigration law, providing services such as assisting clients with their EB-5 immigration petitions and filing such petitions with USCIS. At all relevant times, Chen was the sole partner of the Law Offices, which during the relevant time period had roughly 20 to 30 employees.  At all relevant times, Chen managed, directly or indirectly, all employees of the Law Offices and sets all firm policies.

29.     At all relevant times, Ye was the office manager of the Law Offices.  Although Ye is not a licensed attorney, some of the Law Offices' EB-5 immigration clients believed that he was an attorney.

30.     EB-5 legal clients paid Chen and the Law Offices' legal fees of on average $18,000 for legal work associated with the clients' filings under the EB-5 program.  Clients signed retainer agreements with the Law Offices outlining these fees and the scope of the representation.

31.     The Law Offices has or, at least during the relevant times, had three office locations: (a) San Francisco office: 465 California Street, Suite 425, San Francisco, California 94104; (b) San Jose office: 2107 North First Street, Suite 400, San Jose, California 95131; and (c) Beijing office: Beijing Broadcasting Building, Jianjuomenwai Boulevard No. 14, Suite 1101-2, Chaoyang District, Beijing 100022.

**C.      Chen, Ye, and the Law Offices Acted As Unregistered Brokers; Kuansheng Chen Aided and Abetted their Unregistered Broker Violations**

**1.      Chen, Ye, and the Law Offices Engaged in Brokerage Activity**

32.     In addition to serving as immigration counsel, Chen, Ye, and the Law Offices acted as brokers in connection with hundreds of their EB-5 clients' investments from at least 2008 to at least 2016.

33.     Chen is not, and has never been, registered with the SEC as a broker.

34.     Ye is not, and has never been, registered with the SEC as a broker.

35.     The Law Offices is not, and has never been, registered with the SEC as a broker.

36.     The Law Offices (or their nominees acting on their behalf) entered into several marketing, agency, or consulting agreements with at least five regional centers between 2009 and 2016 that outlined certain brokerage activity that the Law Offices or its nominees were expected to perform.  Chen and Ye facilitated the agreements.  The agreements provided that the Law Offices or its nominees would receive transaction-based compensation in the form of commissions or referral fees in exchange for marketing, advertising, and conducting seminars for certain EB-5 projects and locating and introducing EB-5 investors to the regional centers.

37.     For example, in one agreement dated March 24, 2009, the regional center "grants [the Law Offices] the right to market [the regional center]'s Products worldwide and within the United States…and [the Law Offices] accepts such right and agrees to market [the regional center]'s EB-5 Investor Programs."  Furthermore, the agreement says that the Law Offices "will, at its sole cost and expense, create marketing documents, advertise, and conduct seminars in order to introduce [the regional center]'s EB-5 Investor Programs to potential investors."

38.     In at least one of the agreements, the Law Offices, and thereby Chen and Ye, agreed to be bound by a duty of care and loyalty to the regional center.

39.     The agreements memorialized the transaction-based compensation the regional centers would pay to the Law Offices or its nominees.  Payments were contingent on an investor making the required capital contribution and the government approving the investor's EB-5 petition.

40.     Chen, Ye, and the Law Offices engaged in the activity listed in the agreements from at least 2008 to at least 2016.  They solicited investors in order to earn transaction-based compensation.  Often, Chen, Ye, and the Law Offices advised individuals who had come to the Law Offices for legal counsel to invest with regional centers that were paying commissions to Chen, Ye, and the Law Offices.  Other times, Chen, Ye, and the Law Offices sought out investors through other means, including by traveling to China to seek potential clients.

41.     The Law Offices created marketing materials highlighting specific EB-5 projects.  It also advertised certain regional centers' projects, including on its Chinese website.

42.     Chen, Ye, and the Law Offices also distributed to potential investors marketing materials, such as brochures, that were created by the regional centers.

43.     Additionally, the Law Offices co-hosted seminars featuring certain regional centers for the purpose of soliciting investor clients.  The Law Offices also advertised for the seminars.  The Law Offices conducted at least eight seminars between at least October 2010 and February 2014.  Some seminars occurred in the United States, others occurred in China.

44.     From at least 2008 to at least 2016, Chen, Ye, and the Law Offices also engaged in brokerage activity beyond what was listed in the agency agreements.  They often advised their clients on which EB-5 investment the clients should select.  For certain clients, the Law Offices recommended only one EB-5 investment.  They analyzed the projects from an investment perspective and provided advice on rate of return, ability to exit the investment, and other non-legal matters.  Some clients made investments solely based on the recommendations of Ye or the Law Offices.

SEC v. Jean D. Chen, et al.
Case No. 3:18-cv-06371-LB

8

First Amended Complaint

45.     Chen, Ye, and the Law Offices asked regional centers to hold or reserve limited partnership slots in specific projects that Chen, Ye, and the Law Offices could later fill with clients they solicited and referred to the investment.

46.     Many of the clients of Chen, Ye, and the Law Offices never had direct contact with a regional center.  Instead, Chen, Ye, and the Law Offices communicated with the regional centers on their clients' behalf.

47.     Chen, Ye, and the Law Offices regularly facilitated their clients' investments in the EB-5 offerings by obtaining offering documents from the regional centers and then sending the offering documents to their clients.  Chen, Ye, and the Law Offices would later transmit the signed offering documents back to the regional centers.  At least one marketing agreement required this service, obligating the Law Offices to "assist [regional center] Clients in the process of signing agreements, collecting relevant documents and as well as assisting in all other aspects of transferring of Client's funds to the appropriate [regional center] accounts."

48.     To further facilitate the investment, Chen, Ye and the Law Offices collected and handled millions of dollars of investor funds from clients, which they later distributed to the regional centers.  From at least 2011 to at least 2015, Chen, Ye, and the Law Offices regularly transferred investors' funds through the Law Offices' bank accounts.  From at least 2013 to at least 2015, they even at times used the personal accounts of Chen and Ye to transfer investor funds.

## 2.     Chen, Ye, and the Law Offices Received Transaction-Based Compensation

49.     Chen, Ye, and the Law Offices earned over $12 million in transaction-based compensation from the regional centers.  This is in addition to receiving legal fees from their clients.  Between October 2008 and June 2017, Chen, Ye, and the Law Offices, either directly or indirectly, received compensation in connection with at least 405 investor clients from at least seven regional centers, totaling at least $12,709,500 (at least $10,739,500 for 318 clients from at least five regional centers since January 14, 2013).

50.     The transaction-based compensation typically ranged from $15,000 to $50,000 per investor, in addition to bonus payments for exceeding certain sale levels.  The regional centers typically wired the compensation from their U.S.-based bank accounts.

51.     From October 2008 to December 2013, regional centers sent $2,025,000 in transaction-based compensation from their U.S.-based bank accounts directly into U.S.-based bank accounts held in the name of the Law Offices ($295,000 since January 14, 2013).

52.     In or about 2012, certain regional centers stopped paying transaction-based compensation to U.S.-based individuals and entities because they recognized the payments could violate broker-dealer registration requirements contained in the federal securities laws.

53.     Rather than have regional centers pay the Law Offices directly, Chen, Ye, and the Law Offices sought another way to continue to receive the funds.  They did so by directing their funds overseas and enlisting their family friend or relative, Kuansheng Chen, to assist them in their scheme.

54.     Starting in at least April 2012, Chen, Ye, and the Law Offices directed the regional centers to pay their compensation to China-based bank accounts held in the name of Kuansheng Chen.  That included some compensation that they were already due but the regional centers had not yet paid.  The funds sent to Kuansheng Chen were earned by and for the benefit of Chen, Ye, and the Law Offices.

55.     Kuansheng Chen did not refer investors to the regional centers, but instead served as a "nominee" for Chen, Ye, and the Law Offices.

56.     To give the appearance of legitimacy for receiving transaction-based compensation, Kuansheng Chen purported to be the Managing Director of U.S. Immigration Services of New Horizons, a China-based immigration agency.  However, New Horizons was not an independent agency managed by Kuansheng Chen.  Rather, for all relevant times, it was co-owned and managed by Chen and Ye and was the Beijing branch of the Law Offices.

57.     Upon information and belief, Kuansheng Chen had no substantive involvement with either New Horizons or assisting EB-5 investors in identifying a suitable investment.  Any transaction-based compensation payments directed to or intended for New Horizons and paid to Kuansheng Chen were actually earned and due to Chen, Ye, and the Law Offices.

58.     New Horizons and the Beijing branch of the Law Offices were one and the same.  The address for the Law Offices' Beijing office was the same as the address of New Horizons.

Also, New Horizons was staffed with Law Office employees.  For example, for several years, the email domain and signature block of the manager of the Law Offices' Beijing office indicated that he worked for the Law Offices in its Beijing office.  Additionally, that manager represented to EB-5 investors that he was an employee of the Law Offices during in-person meetings in Beijing.  Only after Chen and Ye became aware that the SEC was investigating New Horizons did the manager remove his affiliations with the Law Offices and replace them with New Horizons.

59.     Likewise, after Chen and Ye became aware of the SEC investigation, Chen and Ye scrubbed all mentions of the Beijing office from Law Offices materials.  Additionally, Chen testified under oath during the SEC investigation that the Law Offices never had a Beijing office and that she never told anyone that the Law Offices had a Beijing office.  These statements by Chen are contrary to, among other things, documents provided to investors by the Law Offices prior to the SEC investigation.  The Law Offices' Beijing location was listed on the Law Offices' website, brochures, retainer agreements, and business cards.

60.     Chen and Ye became co-owners of New Horizons in 2009.  At that time, New Horizons was an existing immigration agency in Beijing that offered services to individuals interested in immigrating to Canada.  Since 2009, all of the Law Offices' activities in China have purportedly been carried out under New Horizon's Chinese Operating Permit because China requires that companies providing immigration services in China have a particular permit.

61.     In order to pay transaction-based compensation to Kuansheng Chen, regional centers required marketing or referral agreements in the name of Kuansheng Chen or New Horizons.  Kuansheng Chen is the signatory to the agreements, but Ye negotiated the terms of the agreements.

62.     After April 2012, when Kuansheng Chen was receiving their transaction-based compensation, Chen, Ye, and the Law Offices continued to correspond with the regional centers as if they were the ones referring investors to the regional centers.  Because they were.  Chen, Ye, and the Law Offices also were the ones who corresponded with the regional centers regarding the payment of the transaction-based compensation to Kuansheng Chen.

63.     From April 2012 to August 2016, at least five U.S.-based regional centers paid from mostly U.S.-based accounts at least $8,781,500 ($8,561,500 since January 14, 2013) to accounts held in the name of Kuansheng Chen.

64.     It is possible that additional regional centers paid Kuansheng Chen additional transaction-based compensation.  The SEC subpoenaed Chen, Ye, and the Law Offices for all documents related to Kuansheng Chen and New Horizons.  Chen, Ye, and the Law Offices failed to produce all documents responsive to those demands.  Despite numerous requests from the SEC, Chen, Ye, and the Law Offices failed to produce certain emails that they were copied on in which regional centers discussed with them transaction-based compensation to be paid to Kuansheng Chen.  The SEC only received those documents from third parties.  In May 2021, Ye admitted in a criminal plea agreement that Ye and Chen destroyed evidence, and instructed another to do the same, after learning of the SEC's investigation.  *United States v. Danhang "Jean" Chen and JianYun "Tony" Ye*, No. 19-cr-00111-LHK (N.D. Cal. May 25, 2021) (Dkt. 93).  Since the SEC does not have insight into the full scope of transaction-based compensation sent to Kuansheng Chen for the benefit of Chen, Ye, and the Law Offices, it is possible that the total amount of transaction-based compensation earned by Chen, Ye, and the Law Offices is higher than $12,709,500.

65.     The transaction-based compensation paid by the regional centers to accounts held in the name of Kuansheng Chen was earned by and for the benefit of Chen, Ye, and the Law Offices, not to the nominee Kuansheng Chen.

66.     Starting in at least December 2016, during the SEC's investigation of the compensation sent to Kuansheng Chen, the regional centers were directed to stop paying compensation to Kuansheng Chen.  Instead, New Horizons had at least two foreign companies act as substitute "nominees" to receive transaction-based compensation through overseas bank accounts on its behalf (Summit International Services Limited and Atlantic Immigration International Group, Ltd.).  Both of the additional nominees are affiliated with New Horizons as subagents.

67.     In December 2016, one regional center paid nominee Summit International Services Limited transaction-based compensation totaling $250,000.

68.     In June 2017, one regional center paid nominee Atlantic Immigration International Group, Ltd. transaction-based compensation totaling $794,000.

**3.     Chen, Ye, and the Law Offices Had Access to and Control of the Funds Held in the Name of Kuansheng Chen**

69.     The transaction-based compensation that regional centers paid to Kuansheng Chen (and later additional nominees affiliated with New Horizons) was for the ultimate benefit of and under the control of Chen, Ye, and the Law Offices.

70.     Chen and employees of the Law Offices had online access to Kuansheng Chen's account in China that held the compensation.  Chen had a physical token which provided the passcode needed to access the account.  Chen or employees of the Law Offices would log into the account from the United States.  At times, Chen or employees of the Law Offices would contact Kuansheng Chen to obtain additional information needed to access the account.  Kuansheng Chen provided the information.

71.     Additionally, up until March 2016, Chen and Ye had access to and controlled a U.S. brokerage account in the name of Kuansheng Chen.  This account appears to have been used, at least in part, for returning to Chen and Ye in the United States the compensation sent by the regional centers to Kuansheng Chen in China.  All transactions out of the Kuansheng Chen brokerage account, which was used more like a checking account, were conducted by Chen or Ye.  Chen was able to access the account pursuant to a power of attorney signed by Kuansheng Chen.  Ye accessed the account by claiming to be Kuansheng Chen.

72.     Most, if not all, transactions out of the brokerage account in the name of Kuansheng Chen were for the benefit of Chen and Ye.  For example, disbursements out of the account included a $1,325,000 wire in November 2013 to Chen, $147,000 in September 2013 for a deposit on the purchase of Chen's and Ye's primary residence, over $60,000 in February 2014 for "Jean Chen Piano," and over $16,000 in October 2014 for property taxes on Chen's and Ye's primary residence.

73.     Ye, acting as Kuansheng Chen, closed the Kuansheng Chen brokerage account in March 2016, shortly after Chen and Ye became aware of the SEC investigation. The remaining funds in the brokerage account were wired, at the direction of Ye, to a California corporation.

**4.  Kuansheng Chen Aided and Abetted the Unregistered Broker Violations of Chen, Ye, and the Law Offices**

74.  Kuansheng Chen knowingly or recklessly provided substantial assistance to Chen, Ye, and the Law Offices in facilitating their unregistered brokerage activity.  He did so, for example, when he executed agreements with regional centers to facilitate the payment of transaction-based compensation and when he allowed Chen, Ye, and the Law Offices to use his foreign account (via the physical token and by providing additional information) to receive commissions.  He also knowingly or recklessly provided substantial assistance when he allowed Chen to move and use funds in the United States through a power of attorney over his U.S. brokerage account.  Kuansheng Chen, as at least the nominal owner of the brokerage account, represented to the brokerage firm that he monitored and was aware of all activities in the account. In making those representations to the brokerage firm, Kuansheng Chen also represented that Chen was his sister.

**D.  Chen and the Law Offices Defrauded the Law Offices' Clients By Failing to Disclose the Transaction-Based Compensation; Ye and Kuansheng Chen Aided and Abetted Such Fraud**

75.  As an attorney and a law firm, Chen and the Law Offices owed fiduciary, legal, and ethical duties to their clients to disclose their receipt of transaction-based compensation from the EB-5 regional centers whose offerings they recommended.

76.  Neither Chen nor any employee of the Law Offices informed investor clients at or before the time of the investment that the Law Offices or its nominees would receive transaction-based compensation in connection with the client's EB-5 investment.

77.  During the relevant time period, clients signed retainer agreements with the Law Offices that outlined the terms of representation by the Law Offices of the client.  The retainer agreements, prepared by Chen and/or employees of the Law Offices, did not contain disclosures that Chen and/or the Law Offices, directly or indirectly, would receive transaction-based compensation in connection with the client's investment.

78.    Separately, the offering documents pertaining to the clients' investments, which were reviewed by Chen and/or employees of the Law Offices and often transmitted by them to investors and USCIS, did not disclose that transaction-based compensation would be paid to Chen or the Law Offices.  While some of the offering documents included a generic statement saying that commissions or referral fees might be paid out of an investor's administrative fees, none of the offering documents specified that any commission would be paid to the investor's immigration attorney.

79.    Certain documents produced by Chen and the Law Offices during the SEC's investigation purport to disclose the transaction-based compensation to investor clients at or around the time of their investment.  However, those documents were manufactured after the SEC began its investigation and were backdated.

80.    For example, the Law Offices transmitted a document they described as a "waiver" to some, if not all, of its investor clients and requested that the clients sign it.  The supposed waiver was transmitted to clients years after the clients' initial investments.  To their investor clients, the Law Offices described this waiver as an internal Law Office memorandum that was needed to fulfill the Law Offices' responsibilities.  For certain investor clients, prior to additional legal services being provided, the Law Offices required the waiver to be signed in addition to a second retainer. The waivers contained pre-typed dates that were set at or around the time of the clients' initial retainer of the Law Offices.  However, the dates on the waivers were not the dates that the clients actually received or signed the waivers.  Instead, for certain clients, the waivers were received from the Law Offices more than three years after their initial retainer was executed with the Law Offices. The waivers were generated after Chen and the Law Offices became aware of the SEC's investigation and appear to have been created in response to the investigation.

81.    Even if the waivers existed and were provided to clients at the time of the investment, the disclosures contained therein were inadequate.  A waiver provides that the Law Offices "has referred clients to regional center and has received fees from regional center as a result of those referrals."  It continues, "the possibility that the [Law Offices] may receive referral fees or clients [sic] referrals from regional center in the future, may be perceived as creating a conflict."

The manufactured waivers do not disclose that Chen or the Law Offices will receive transaction-based compensation on that client's investment.

82.     Chen and the Law Offices knew, or at least were reckless or negligent in not knowing, that their receipt of transaction-based compensation was not disclosed or there were material omissions in purported disclosures to their foreign clients investing in the EB-5 offerings.

83.     Chen and the Law Offices' receipt of transaction-based compensation from the regional centers would have been material to a reasonable investor's investment decision.

84.     Both Ye and Kuansheng Chen knew, or were at least reckless in not knowing, that neither Chen nor the Law Offices disclosed their receipt of commissions to their clients.

85.     For Ye's part, he actively solicited clients and transmitted retainer agreements that failed to disclose Chen's receipt of such compensation.  He also directed the regional centers to pay the commissions to an overseas account, thereby further concealing commissions from clients.

86.     For Kuansheng Chen's part, he knew from executing the referral agreements with regional centers that the transaction-based payments were being made to appear as if he was the one earning and receiving them.  He also took steps to assist Chen and the Law Offices in hiding the commissions from clients by allowing Chen and the Law Offices to use his bank account.

E.     **Fraud Regarding Management and Control of Golden State and Its Projects**

87.     Chen, Ye, and the Law Offices' fraud on their clients did not stop with their receipt of millions of dollars of undisclosed funds from independent regional centers.  To further profit, they acquired and secretly controlled a regional center to which they steered unsuspecting clients.

88.     Defendant Golden State is a USCIS-approved EB-5 regional center.  In September 2014, Chen and Ye, through one of their companies, purchased Golden State and managed and controlled it at all times during the relevant period.

89.     Beginning in 2014, Chen, Ye, and the Law Offices advised their legal clients to invest in Golden State's projects.  They facilitated those investment transactions without disclosing that Chen and Ye managed and controlled Golden State.

90.     Chen and Ye placed a nominee, Defendant Kai Robinson, at the helm of Golden State.  The private placement memoranda for the Golden State projects, drafted by the Law Offices,

state, among other things, that the "Manager of Golden State Regional Center, LLC is Kai Robinson." At the relevant times, that was not true. Chen and Ye, not Robinson, managed the regional center, and Ye has now admitted in his recent criminal plea agreement that it was deceptive to represent Robinson as the "Manager" of Golden State.

91.     Under the direction of Chen and Ye, Golden State sponsored at least three EB-5 projects – Bay Area I,[1] Bay Area II,[2] and a third project.[3] Golden State served as the manager of Bay Area I and Bay Area II. As with Golden State itself, the Bay Area I and II projects that it sponsored were under the undisclosed management and control of Chen and Ye.

92.     Since October 2014, Golden State has offered and sold at least 80 securities in the form of membership interests in the Bay Area I project. The Bay Area I project was structured as a vehicle for loaning funds to Fremont Hills to develop and construct a mixed-use development on two parcels in Fremont, California.

93.     Chen, Ye, and/or the Law Offices recommended investing in the Bay Area I project to at least some of the Law Offices' legal clients. The Law Offices served as EB-5 legal counsel to at least 76 Bay Area I investors.

94.     The Bay Area I investors paid at least $40 million ($500,000 each) of capital contributions through an offering of the membership interest units in Bay Area I. The investors paid at least an additional $4 million ($50,000 each) in required administrative fees to cover administration, marketing, and operating costs, which investors paid into a Bay Area I bank account and were later transferred to a Golden State account. Until the SEC began its investigation, and undisclosed to most, if not all, of the investors, Chen and Ye were the only ones who could access and control those funds.

---

[1] The Bay Area I project is also referred to as Sabercat, Mission Hills Square, or the Fremont project.

[2] The Bay Area II project is also referred to as the Kawana Meadows or the Santa Rosa project.

[3] Golden State's third project has been sponsored by agreement for a third party. While the Law Offices, Chen, and Ye were involved in some ways with the third project, they are not known to control the project; therefore, it is not a subject of this action.

95.     Since at least August 2015, Golden State has offered and sold at least 25 investments in the form of membership interests in the Bay Area II project.  The Bay Area II project was structured as a vehicle for loaning funds to Kawana Meadows to develop and construct a residential development on a parcel in Santa Rosa, California.

96.     Chen, Ye, and/or the Law Offices recommended investing in the Bay Area II project to at least some of the Law Offices' legal clients.  The Law Offices served as EB-5 legal counsel to at least 13 Bay Area II investors.

97.     At least 25 investors paid a total of $12.5 million ($500,000 each) of capital contributions through an offering of the membership interest units in Bay Area II.  The investors paid at least an additional $1.25 million ($50,000 each) in required administrative fees to cover administration, marketing, and operating costs, which investors paid into a Bay Area II bank account and were later transferred to a Golden State account.  Until the SEC began its investigation, and undisclosed to most, if not all, of the investors, Chen and Ye were the only ones who could access and control those funds.

98.     Chen, Ye, Robinson, the Law Offices, Tree Lined, and Golden State were all involved in defrauding Golden State investors regarding the true control and management of Golden State and its projects, as set forth in detail below.

   1.     **Undisclosed to Investors, Chen and Ye, with the Assistance of the Law Offices, Controlled Golden State and Managed Its Operations**

99.     Golden State was originally formed on January 3, 2012 by individuals not previously affiliated with Chen, Ye, or Robinson.

100.    In October 2014, Chen and Ye, through their company Tree Lined, acquired Golden State from the original owners.

101.    The purchase of the regional center was made in connection with the purchase of the property used for Golden State's first project.  The property was sold to Tree Lined for $9.5 million as part of bankruptcy proceedings.  A condition of the sale was the transfer of Golden State from the original owners to Tree Lined in exchange for $250,000.  On September 26, 2014, Chen wired

$250,000 from a Law Offices bank account to the law firm handling the bankruptcy to fund the transfer of Golden State.

102.    Golden State was later purportedly assigned to Robinson, but in name only.

103.    Only days before it was assigned to Robinson, Chen planned on assigning Golden State to a Tree Lined employee instead of Robinson.

104.    Robinson did not pay anything for Golden State.

105.    Robinson did not have control of Golden State.  At the time, she was a mere figurehead put in place by Chen and Ye.

106.    After the acquisition, Chen and Ye began setting up the operations of Golden State.

107.    On October 28, 2014, Ye registered Golden State's email account – goldenstaterc@gmail.com.

108.    On October 25, 2014, Chen and Ye opened bank accounts in the name of Golden State.  On the Business Account Application, Chen and Ye signed, certified, and agreed that they were Managing Members of Golden State and Key Executives with Control of the Entity.

109.    On the same day, Chen and Ye opened a bank account in the name of Bay Area I. On the Business Account Application, Chen and Ye also signed, certified, and agreed that they were Managing Members of Bay Area I and Key Executives with Control of the Entity.

110.    Later, on August 18, 2015, Ye opened a bank account in the name of Bay Area II, where both he and Chen were the only authorized signers.  On the Statement of Entity Ownership and Control, Ye signed and certified that he was the Manager of Bay Area II and a Key Executive with authority and control to manage the entity.

111.    Until the SEC started its investigation, Chen and Ye were the only signatories on the accounts of Bay Area I and Bay Area II, and Chen, Ye, and the Law Offices' accounting assistant were the only signatories on the account of Golden State.  The Law Offices' accounting assistant would only access Golden State's bank account at the direction of Chen or Ye.  Chen and Ye, directly or through their accounting assistant, made numerous transactions in and out of the Golden State, Bay Area I, and Bay Area II accounts prior to the SEC's investigation.  Those transactions included moving investor funds in and out of accounts for companies controlled by Chen and Ye.

112.     Initially, employees of the Law Offices, at the direction of Chen and Ye, managed the ongoing operations of Golden State.  The Law Offices arranged for Golden State to obtain office space located adjacent to the Law Offices.  Communications with the property manager were handled by employees of the Law Offices, the rent statements for Golden State's office space were addressed to Golden State and Tree Lined and sent to the Law Offices, and the Law Offices handled the payment of rent on the office space used by Golden State.  After the SEC began its investigation and prior to the expiration of the lease agreement, Golden State relocated its offices.

113.     Starting in 2014 and through at least the start of the SEC's investigation, multiple Law Offices employees worked in Golden State's offices on Golden State matters. Communications regarding Golden State were directed to Chen, Ye, and employees of the Law Offices.  Golden State's main phone number connected to a Law Offices cell phone, and calls to Golden State were answered by employees of the Law Offices.  Employees of the Law Offices attended external meetings regarding the development of Golden State projects.  Upon information and belief, no independent Golden State employees attended those meetings.

114.     The Law Offices was not compensated in any way for the extensive work it completed for the benefit of Golden State.

115.     That work included drafting the offering documents for Golden State's Bay Area I and Bay Area II projects.

116.     The Bay Area I offering documents consist of at least (1) a private placement memorandum ("PPM") dated December 22, 2014; (2) a Subscription Agreement attached to the PPM as Appendix A; (3) an Operating Agreement attached to the PPM as Appendix B; (4) a Loan Agreement attached to the PPM as Appendix C; (5) a Property Grant Deed, and Architectural Renderings attached to the PPM as Appendix D; (6) a Fremont City Planning Application for Rezoning attached to the PPM as Appendix E; (7) an Economic Report attached to the PPM as Appendix F; and (8) a Market Feasibility Study attached to the PPM as Appendix G (collectively, the "Bay Area I Offering Documents").  The Bay Area I Offering Documents were submitted to USCIS as part of each investor's I-526 petition.

117.     The Bay Area II offering documents consist of at least (1) a private placement memorandum ("PPM") dated August 10, 2015; (2) a Subscription Agreement; (3) an Operating Agreement; and (4) a Loan Agreement (collectively, the "Bay Area II Offering Documents").  The Bay Area II Offering Documents were submitted to USCIS as part of each investor's I-526 petition.

118.     At the time of their investment, each Bay Area I and II investor signed the Bay Area I or II Subscription Agreement, which provided that the investor acknowledged that she or he requested, received, and read the current Confidential PPM of Bay Area I or II and the Operating Agreement.  By signing the Bay Area I or II Subscription Agreement, the investor also acknowledged that she or he had been provided the opportunity to review the Offering Documents and ask any questions concerning the offering's terms and conditions.  Each investor also signed a Bay Area I or II Operating Agreement and Investor Questionnaire at the time of their investment.

119.     Both the Bay Area I and Bay Area II PPMs disclose that "[t]he offering documents have previously been drafted and reviewed by the Law Offices" but materially omit any disclosure of the role that Chen, Ye, and the Law Offices had in the management and control of Golden State.

120.     Neither Chen nor Ye disclosed in the Bay Area I or II Offering Documents or elsewhere that they controlled and managed Golden State with the assistance of Law Office employees.

121.     The Bay Area I and II Offering Documents disclose a variety of conflicts of interests, but omit the conflict resulting from Chen, Ye, the Law Offices, and Tree Lined's involvement in the regional center or the projects.  For example, the Bay Area I and Bay Area II PPMs describe possible conflicts with the "allocation of manager's time" and "developers transactions with related parties."  The Bay Area I PPM also states that the success of Bay Area I is "dependent on the ability of the Developer's management team to carry out its business plans" and "will also depend on other factors, including the quality of the senior management of [Golden State]."  These statements emphasize the importance of the manager in the success of the investment, but the documents fail to disclose the true identity of that manager.

122.    Chen and Ye also did not disclose in the Bay Area I or II Offering Documents or elsewhere that Chen and Ye, prior to the SEC's investigation, were the only ones who could access and control the investors' investment funds and administrative fees.

123.    The Bay Area I and II Operating Agreements depict the use and control of money, but materially omit who is actually controlling the investor funds and fees.  They state that Golden State shall have "complete and exclusive power and responsibility" "for all investment and investment management decisions to be undertaken on behalf of [Bay Area I or II]."  They also provide that Golden State shall have "complete and exclusive power and responsibility" "to manage and administer the business and affairs of [Bay Area I or II] in good faith…."  The Operating Agreements do not disclose that Chen and Ye managed and controlled Golden State and thus had "complete and exclusive power and responsibility" "for all investment and investment management decisions to be undertaken on behalf of" the Bay Area projects.

**2.      Despite Telling Investors Otherwise, Robinson Was Not the Manager of Golden State**

124.    Not only did Chen and Ye fail to disclose their true interests in Golden State and its projects, but they sought the assistance of a friend to make affirmative misstatements regarding the management of Golden State.  The Bay Area I and II Offering Documents state that Robinson was the sole manager of Golden State.  That was false.

125.    At the time individuals invested in the Golden State projects, Robinson did not manage or control Golden State.  Instead, Robinson's involvement in the operations of Golden State was designed to give the illusion that a third party independent of Chen and Ye managed the Golden State projects.  Ye admitted in his May 2021 criminal plea agreement that it was deceptive to identify Robinson as the "manager" of Golden State and to represent in Golden State subscription documents that Robinson fully controlled the entity and its operations.

126.    Robinson is a friend of Chen and Ye and worked at one point at the Law Offices.  According to Chen, Robinson worked at the Law Offices as a tax planning assistant from July 2013 to September 2013.  On information and belief, Robinson remained on the payroll of the Law Offices for up to eight months after this period.  From November 2013 until at least April 2017,

Robinson lived in a condominium owned in the name of Kuansheng Chen.  When she paid rent, which was only sporadically, she paid it to Ye.  In July 2018, Robinson purchased a separate condominium from Tree Lined.

127.     Prior to 2016, Robinson knew and permitted her name to be used as the manager of Golden State even though she did not actually manage Golden State.  Acting as a mere figurehead manager at the request of Chen and Ye, Robinson began signing documents on behalf of Golden State.  Robinson, for example, signed a certificate of limited partnership in November 2014 and a loan agreement between Golden State and Tree Lined in October 2015.  Robinson's signature (or a facsimile of it) also appeared on the Bay Area I and Bay Area II Offering Documents and accompanying letters.  Robinson herself transmitted some of these documents to certain investors via the Law Offices.  For such figurehead work, Golden State, through the bank account controlled by Chen and Ye, paid Robinson $5,000 as a "1099" employee in March 2015.

128.     While pretending to be the actual manager of Golden State, from 2015 to June 2016, Robinson held full-time jobs with unrelated companies.  For 30 to 40 hours per week, Robinson worked as a contractor for a pharmaceutical company from 2015 to March 2016.  Robinson also worked for an online reservation company from April 2016 to June 2016.  There, she worked for at least 30 hours per week in offices located at least 40 miles from Golden State's office space.  Robinson worked with a placement agency to secure these positions.

129.     According to the resume Robinson used to obtain contracting work in at least April 2016, Robinson was a "Senior Project Financial Analyst" from 2011 to 2015 for the employer "Golden State Regional Center – Law Office of Jean Chen," listing the two entities on the same line.  She did not state that she served as the manager or the owner of the regional center.  Instead, she described her duties as performing due diligence, creating financial models, and building detailed P&L models, among others.

130.     In 2016, after the SEC began its investigation of Golden State, Chen and Ye enlisted Robinson full time for the purpose of furthering their scheme, and Robinson took increasingly active steps in giving others the false impression that she was the true manager of Golden State.  For example, in April 2016, Robinson, along with and at the direction of Chen and Ye, began

communicating and meeting with an SEC compliance professional specializing in EB-5 compliance.  On April 30, 2016, Golden State paid Robinson $2,562.14 for "April payroll" (again paid for out of the account controlled by Chen and Ye).  Starting in June 2016, Robinson also no longer held full-time jobs at other companies.  On June 7, 2016, she filed an amended Statement of Information with the California Secretary of State listing herself publicly for the first time as the manager and agent for service of process for Golden State.  (The previous agent was a Law Offices employee.)  On June 22, 2016, Robinson was added as an authorized signer on the Golden State bank account.  That same day, she was added as an authorized signer on the Bay Area I and Bay Area II bank accounts.  In or around June 2016, Robinson began working from a desk at the Law Offices so that Chen and Ye could coach her on how to handle Golden State's affairs.  In 2016, she also amended her 2015 personal tax returns to make it appear as if she had owned Golden State in 2015, although she had not.  Going forward, Robinson received a salary from Golden State.

131.    While Robinson was engaged in furthering the false impression that she was the manager of the regional center, Golden State continued to solicit individuals for investments in projects, and several of them invested in the Bay Area II project.  As examples:

(a)    One investor signed the Bay Area II Subscription and Operating Agreements on June 11, 2016, invested in the project on July 7, 2016, and signed the I-526 petition on August 9, 2016.  On July 7, 2016, Robinson emailed a letter confirming receipt of the investment funds to the Law Offices.

(b)    Another investor signed the Bay Area II Subscription and Operating Agreements on July 28, 2016, invested in the project on June 28, 2016, and signed the I-526 petition on July 28, 2016.  On June 29, 2016, Robinson emailed a letter confirming receipt of the investment funds directly to the investor, and on August 16, 2016, Robinson emailed that investor's counter-signed subscription agreement to the Law Offices, which falsely listed Robinson as manager of Golden State and omitted the roles of Chen and Ye.

(c)    A third investor signed the Bay Area II Subscription Agreement on July 5, 2016, invested in the project on July 6, 2016, and signed the I-526 petition on August 23, 2016.  On July 7, 2016, Robinson emailed a letter confirming receipt of the investment funds to the investor's

agent, and on August 22, 2016, Robinson emailed that investor's counter-signed subscription agreement to the Law Offices, which falsely listed Robinson as manager of Golden State and omitted the roles of Chen and Ye.

132.    While continuing to act for Chen and Ye and helping to maintain the façade that Golden State was independent of Chen and Ye, Robinson also took on a role in responding to the SEC's investigative subpoenas.  In response to those subpoenas, the SEC received incomplete productions and documents that were altered or manufactured.  In October 2016, the SEC subpoenaed Robinson for testimony, and in April 2017, she testified under oath at the SEC's in Washington DC.  Robinson testified falsely that, among other things, she had been the owner and manager of Golden State since 2014 and that Chen and Ye had no ownership or management interest in Golden State.  During the testimony, Robinson was unable to answer basic questions about the operations of Golden State, including regarding agreements entered into by Golden State.

133.    From 2014 until at least the SEC filed its original Complaint on October 18, 2018, Robinson acted of her own free will at the direction of Chen and Ye, and Chen and Ye remained in control of Golden State.  At no time did Robinson inform the investors that Chen and Ye owned and directed the affairs of Golden State.  Instead, throughout this time, she facilitated the spread of false statements and a façade to investors and assisted Chen, Ye, and Golden State in their fraud.

134.    For this work, Robinson received over $500,000 from Golden State from April 2016 through the end of 2018, and she has continued to receive payment since that time.

**3.    Undisclosed to Investors, Chen and Ye Funded the Land Purchases and Facilitated the Development of the Bay Area I and II Projects**

135.    Bay Area I and II investors, the vast majority of whom were the legal clients of Chen and the Law Offices, were never informed in the Bay Area I or II Offering Documents or elsewhere that Chen and Ye had their hands in nearly every step of the investors' EB-5 investment.

**a.    Chen and Ye Purchased the Land for the Bay Area I Project Through Their Company Tree Lined**

136.    Chen and Ye, through their company, Tree Lined, purchased the land used for the Bay Area I development.  This was not disclosed to investors.

137.   The Bay Area I PPM states that the project property is owned by the developer, Fremont Hills.  It provided that the property grant deed was conveyed to the developer and recorded on October 8, 2014.  In actuality, the Bay Area I land was purchased by Chen and Ye's company, Tree Lined, in September 2014 and merely assigned to Fremont Hills.  Tree Lined opened escrow for the purchase, made deposits of $2 million, and completed due diligence.  At the conclusion of the transaction, an additional $7.5 million was paid for the Bay Area I property through companies owned by Chen and Ye.

138.   Chen and the Law Offices never disclosed to their legal clients the conflict arising from Chen and Ye's financial interest in the property.  Nor did Golden State disclose this to the investors.  Additionally, Golden State never disclosed that an entity other than Fremont Hills provided the funds for the property despite the Bay Area I PPM saying that Fremont Hills was the developer and had invested $16 million in acquisition costs including the cost of the land.

**b.     Ye, the Law Offices, and Tree Lined Were Involved in the Development of the Bay Area I Project**

139.   Ye, acting with the assistance of the Law Offices and Tree Lined, facilitated the development of the Bay Area I project, which was listed in the Offering Documents as being developed by Fremont Hills.  This was not disclosed to investors.

140.   Bay Area I investors loaned $40 million to Fremont Hills disbursed over a period of years, from 2015 through at least 2018, pursuant to a Loan Agreement and Promissory Note.  The Loan Agreement and Promissory Note were both dated January 1, 2015, and were provided to investors as part of the Bay Area I Offering Documents.  These documents do not disclose that Ye, the Law Offices, and Tree Lined were involved in Fremont Hills.

141.   Decisions about the construction of the Bay Area I project were made by Ye, the Law Offices, and Tree Lined.  Ye and Law Offices employees regularly performed non-legal work related to the development of Bay Area I.  Neither Ye nor the Law Offices were compensated by clients for this work.  They often did the work under the name of Tree Lined or Fremont Hills.

142.    Starting in December 2014, the Law Offices held daily meetings concerning the development of the Bay Area I project.  These meetings did not involve legal services.  The daily Bay Area I meetings were supervised by, and reported to, Ye.

143.    Outside contractors often contacted Ye or the Law Offices on issues related to the development of Bay Area I.  Again, the issues were not legal in nature.  The contractors often sought payment from Ye or the Law Offices for Bay Area I development work.

144.    Ye hired professionals to provide services for the development of Bay Area I.  In February 2015, on behalf of the Bay Area I project, Ye signed an engagement agreement with a law firm to draft project documents.

145.    Fremont Hills was not a separate development company independent of Chen or Ye. At its incorporation, the initial street address for Fremont Hills was the Law Offices' San Jose office.  Ye, at times, also acted as the manager, contact, owner, and/or CEO of Fremont Hills.

146.    In March 2015, a Bay Area I evaluation and study was addressed to Ye on behalf of Fremont Hills.  In early 2016, Ye was the contact for Fremont Hills for the Bay Area I civil engineer, and the Law Offices informed the civil engineer that Ye was the CEO of Fremont Hills. In early to mid-2016, Ye represented himself as the President or Manager of Fremont Hills in order to obtain construction permits.

147.    Ye also was a signatory on the Fremont Hills bank account for a period of time, which received Bay Area I investor funds.  On December 14, 2015, Ye was added as an authorized signer to the Fremont Hills bank account, stating he was a director and officer of Fremont Hills. Two months later, after he learned of the SEC investigation, Ye was removed as an authorized signer on the account.  During the time he had access, Ye wrote several checks from the Fremont Hills account, including a check to the Law Offices.

148.    For some period of time, Tree Lined held itself out as the developer of Bay Area I. For example, Ye met with the Superintendent and Associate Superintendent of Fremont Unified School District as President of Tree Lined on behalf of Bay Area I in January 2016.  Additionally, promotional materials for Tree Lined state that Tree Lined is the developer of Bay Area I.  Further,

in May 2016, Ye and Tree Lined met with a construction and project management company in order to obtain a proposal for the Bay Area I project.

149.    The Bay Area I Business Plan states that the developer, Fremont Hills, was in the process of obtaining $56 million in bank loans as additional equity for the Bay Area I project.  In actuality, Ye was the one seeking the additional equity.  In November 2015, Ye and Tree Lined hired a real estate investment banking firm in order to secure the additional funding for Bay Area I.  At the same time, Ye and employees of the Law Offices were contacting several banks and other individuals and entities in an attempt to secure that additional financing.  Also in November 2015, Ye signed a confidentiality and non-circumvention agreement and a placement and fee agreement with a commercial mortgage brokerage firm as Managing Partner of Fremont Hills.

150.    Although not part of the Bay Area I Offering Documents, the Law Offices provided certain investors with a presentation on Bay Area I dated 2014.  The Bay Area I Law Offices' presentation states that a California-based bank had agreed to provide a loan of $40 million for the Bay Area I project.  There is no evidence to indicate that the bank had ever agreed to provide such a loan.

151.    The involvement of Ye, the Law Offices, and Tree Lined in the development of the Bay Area I project was not disclosed to investors in the Bay Area I Offering Documents or elsewhere.  The PPM lists and describes the backgrounds and experience of the three principles of Fremont Hills, the "Developer," but does not disclose the involvement of Ye, the Law Offices, and Tree Lined.

c.    **Bay Area I Investors May Lose Their Entire Investments on Account of the Conduct of Chen, Ye, the Law Offices, Tree Lined, and Robinson**

152.    On February 11, 2019, a privately-held real estate corporation made a public announcement stating that it had acquired the Bay Area I project for $240 million in a combination of cash and stock.  The Loan Agreement and Promissory Note between Fremont Hills and Bay Area I provide that Fremont Hills would retain the existing ownership structure of Fremont Hills and not issue any additional ownership interests in Fremont Hills without Bay Area I's prior written consent.  The Loan Agreement, in particular, also provides that "[n]either party may assign its rights

or obligations under this Agreement without the prior written consent of the other party."  However, neither Bay Area I investors nor Golden State (as the manager of the Bay Area I fund) ever provided consent to the sale of the Bay Area I project or were made aware of the sale of the project before the public announcement.  The ownership structure of the Bay Area I project has now changed several times since the filing of the original Complaint, without consent of Bay Area I.

153.    The Loan Agreement between Fremont Hills and Bay Area I also provides that Bay Area I may foreclose on the project property and that "the loan is secured as a junior loan." Fremont Hills' Promissory Note provides, similarly, that "[t]his Note is secured by [the project] property."  But at no relevant time did the Law Offices, Tree Lined, Chen, Ye, or Robinson take any steps to publicly record the agreed upon lien associated with the Bay Area I loan and perfect Bay Area I's security interest in the Bay Area I property.

154.    Since the filing of the original Complaint, the Bay Area I project has gone into bankruptcy, and Fremont Hills has failed to make the required interest payments associated with Bay Area I's investment in the project.  Fremont Hills has fully defaulted on making any of the principal payments as well.  Additionally, Fremont Hills and its successor owners have claimed— contrary to the terms of the offering documents provided to Bay Area I investors—that Bay Area I's $40 million loan to the project is not secured by the Bay Area I property.

155.    On February 4, 2022, in private litigation filed by investors in the Bay Area I fund, the Superior Court of California, County of Alameda, entered a temporary restraining order that, among other things, enjoined Robinson and Golden State from further managing Bay Area I or any of its accounts and activities, or from transferring, disbursing, spending, or encumbering any of the assets of the Bay Area I fund, until further court order.

**d.    Chen, Ye, and Tree Lined Were Involved in the Purchase of the Land for the Bay Area II Project**

156.    Although the land used for the Bay Area II development was purchased in the name of Kawana Meadows, all funds for that purchase came from accounts controlled by Chen and Ye. On April 15, 2015, Chen or Ye wired $50,000 as a deposit for the land from a Tree Lined bank account.  On June 3, 2015, Chen or Ye wired an additional wired $150,000 for the land from the

same Tree Lined bank account.  On June 4, 2015, Ye, posing as Kuansheng Chen, wired $3 million from Kuansheng Chen's U.S. brokerage account for the land.  Finally, on June 9, 2015, Chen or Ye wired the remaining $6,769 from the Tree Lined bank account to complete the purchase of the Bay Area II land.  The involvement of Chen, Ye and Tree Lined in the purchase of the Bay Area II land was not disclosed to investors.

157.    The Bay Area II PPM states that the Developer, Kawana Meadows, has invested over $9 million in acquisition costs including the land, and that that equity investment will be a part of the total capital for the development of the Bay Area II project.  In actuality, the Bay Area II land was paid for by Chen and Ye through accounts they controlled.

158.    Chen and the Law Offices never disclosed to their legal clients the conflict arising from Chen and Ye's financial interest in the property.  Nor did Golden State disclose this to investors.  Additionally, Golden State never disclosed that an entity other than Kawana Meadows provided the funds for the property despite the Bay Area II PPM saying that the developer had invested $9 million in acquisition costs including the cost of the land.

  **e.**  **Ye, the Law Offices, and Tree Lined Were Involved in the Development of the Bay Area II Project**

159.    Ye, acting with the assistance of the Law Offices and Tree Lined, was involved in the development of the Bay Area II project, which was listed in the Offering Documents as being developed by Kawana Meadows.  This was not disclosed to investors.

160.    Promotional materials for Tree Lined state that Tree Lined is the developer of Bay Area II and Ye is the president and lead project developer of Tree Lined.

161.    In August 2015, the Law Offices obtained the Bay Area II economic analysis report. In September 2015, the Law Offices obtained the feasibility study for Bay Area II.

162.    In September 2015, Tree Lined requested a letter of support from the City of Santa Rosa for Bay Area II regarding a USCIS requirement.  Also in September 2015, Tree Lined requested and obtained a Targeted Employment Area certification from the State of California for Bay Area II, a USCIS requirement.

163.   The involvement of Ye, the Law Offices, and Tree Lined in the development of the Bay Area II project was not disclosed to investors in the Bay Area II Offering Documents or elsewhere.  The Bay Area II PPM lists and describes the background and experience of the principle of Kawana Meadows, the "Developer," but does not disclose the involvement of Ye, the Law Offices, and Tree Lined.

**4.     Chen, Ye, the Law Offices, and Golden State Defrauded Golden State Investors; Tree Lined and Robinson Aided and Abetted Such Fraud**

164.   As an attorney and a law firm, Chen and the Law Offices owed fiduciary, legal, and ethical duties to their clients to disclose their control of and involvement in Golden State whose offerings they recommended.

165.   Chen and the Law Offices knew, or at least were reckless or negligent in not knowing, that Chen, Ye, and the Law Offices' management and control of Golden State and its Bay Area projects was not disclosed to all of Chen and the Law Offices' foreign clients investing in Golden State's EB-5 offerings.

166.   The conflict of interest created by Chen, Ye, and the Law Offices' management and control of Golden State and its Bay Area projects would have been material to a reasonable investor's investment decision.

167.   Chen and the Law Offices obtained money by means of these omissions in that they raised millions in investor funds for Golden State (which Chen, Ye, and the Law Offices controlled) that they may otherwise have not raised if the conflict had been disclosed.

168.   Similarly, Golden State made material misstatements and omissions to Golden State investors regarding the management and control of Golden State, its projects, and investor funds.

169.   Golden State, Chen, and Ye knew that Chen, Ye, and the Law Offices' management and control of Golden State and its Bay Area projects was not disclosed to the investors investing in Golden State's EB-5 offerings.  Golden State, Chen, and Ye knew that the Bay Area I and II Offering Documents misstated that Robinson was the sole manager of Golden State.

170.   Chen, Ye, and the Law Offices' management and control of Golden State and its Bay Area projects would have been material to a reasonable investor's investment decision.

171.    As a result of the misstatements to investors and the scheme to conceal the true corporate structure, on information and belief, Golden State secured investment funds from individuals that otherwise likely would have not invested in Golden State projects.

172.    Both Robinson and Tree Lined knew, or were at least reckless in not knowing, that the true management and control of Golden State and the Bay Area projects were not disclosed to investors.

173.    For Robinson's part, she took substantial steps to make it appear as if she was the manager of Golden State even though she was not the one who actually managed or controlled Golden State as fully described above.

174.    For Tree Lined's part, knowledge of Ye is imputed to Tree Lined because Ye controlled Tree Lined.  Ye manages the employees of Tree Lined and sets company policies.

## TOLLING AGREEMENTS

175.    Chen, Ye, the Law Offices and Tree Lined signed in December 2017, February 2018, and June 2018 tolling agreements entered into with the SEC.  Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Defendants] authorized, instituted, or brought by…the Commission…arising out of the [Commission's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended…."  Each tolling agreement further provides that the Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

176.    Collectively, these agreements tolled the running of any limitations period or any other time-related defenses alleged in this Complaint as to Chen, Ye, the Law Offices, and Tree Lined for a period of at least 277 days.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (Against Defendants Chen, Law Offices, and Golden State)

177. The SEC realleges and incorporates by reference paragraphs 1 through 176 above.

178. By engaging in the conduct described above, Chen, Law Offices, and Golden State, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

179. Chen, Law Offices, and Golden State each knew, or were reckless in not knowing, that she or it employed devices, schemes and artifices to defraud. Chen, Law Offices, and Golden State each knew, or were reckless or negligent in not knowing, that she or it obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

180. By engaging in the conduct described above, Chen, Law Offices, and Golden State violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3)].

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Aiding and Abetting Violations of Section 17(a) of the Securities Act

### (Against Defendants Ye, Kuansheng Chen, Robinson, Tree Lined, and Law Offices)

181. The SEC realleges and incorporates by reference paragraphs 1 through 180 above.

182.     By engaging in the conduct described above, and particularly as set forth in the First Claim for Relief above, Chen, Law Offices, and Golden State each violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

183.     Ye and Kuansheng Chen, by their actions described above, each knowingly or recklessly provided substantial assistance to Chen and the Law Offices' violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] with regard to the failure to disclose transaction-based compensation.

184.     Ye, Robinson, and Tree Lined, by their actions described above, each knowingly or recklessly provided substantial assistance to Chen, the Law Offices, and Golden State's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] with regard to the management and control of Golden State and the Bay Area projects.

185.     With respect to those Golden State investors for whom the Law Offices did not serve as legal counsel, the Law Offices, by its actions described above, knowingly or recklessly provided substantial assistance to Golden State's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] with regard to the management and control of Golden State and its Bay Area projects.

186.     Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Ye, Kuansheng Chen, Robinson, Tree Lined, and Law Offices each, directly or indirectly, have aided and abetted and, unless restrained, will continue to aid and abet violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3)].

### THIRD CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against Defendants Chen, Law Offices, and Golden State)

187.     The SEC realleges and incorporates by reference paragraphs 1 through 176 above.

188.     By engaging in the conduct described above, Chen, Law Offices, and Golden State each, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national

securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

189.    Chen, Law Offices, and Golden State each knew, or was reckless in not knowing, that she or it employed devices, schemes, or artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

190.    By engaging in the conduct described above, Chen, Law Offices, and Golden State each violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c)].

**FOURTH CLAIM FOR RELIEF**

**Fraud in Connection with the Purchase or Sale of Securities**

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against Defendants Ye, Kuansheng Chen, Robinson, Tree Lined, and Law Offices)**

191.    The SEC realleges and incorporates by reference paragraphs 1 through 176 and paragraphs 188 through 190 above.

192.    By engaging in the conduct described above, and particularly as set forth in the Third Claim for Relief above, Chen, Law Offices, and Golden State each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

193.    Ye and Kuansheng Chen, by their actions described above, each knowingly or recklessly provided substantial assistance to Chen and the Law Offices' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] with regard to the failure to disclose transaction-based compensation.

194.    Ye, Robinson, and Tree Lined, by their actions described above, each knowingly or recklessly provided substantial assistance to Chen, the Law Offices, and Golden State's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] with regard to the management and control of Golden State and the Bay Area projects.

195.    With respect to those Golden State investors for whom the Law Offices did not serve as legal counsel, Law Offices, by its actions described above, knowingly or recklessly provided substantial assistance to Golden State's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] with regard to the management and control of Golden State and the Bay Area projects.

196.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Ye, Kuansheng Chen, Robinson, Tree Lined, and Law Offices each, directly or indirectly, have aided and abetted and, unless restrained, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c)].

### FIFTH CLAIM FOR RELIEF

### Failure to Register as a Broker-Dealer

### Violations of Section 15(a) of the Exchange Act

### (Against Defendants Chen, Ye, and the Law Offices)

197.    The SEC realleges and incorporates by reference paragraphs 1 through 176 above.

198.    Chen, Ye, and the Law Offices by engaging in the conduct described above, each made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities, without being registered as brokers or dealers in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

199.    By engaging in the conduct described above, Chen, Ye, and the Law Offices each violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIXTH CLAIM FOR RELIEF

### Failure to Register as a Broker-Dealer

### Aiding and Abetting Violations of Section 15(a) of the Exchange Act

### (Against Defendant Kuansheng Chen)

200.    The SEC realleges and incorporates by reference paragraphs 1 through 176 and paragraphs 198 through 199 above.

201.    By reason of the conduct described above, and particularly as set forth in the Fifth Claim for Relief above, Chen, Ye, and the Law Offices each violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

202.    Kuansheng Chen knowingly or recklessly provided substantial assistance to Chen, Ye, and the Law Offices' violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], by his actions described above.

203.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Kuansheng Chen, directly or indirectly, has aided and abetted and, unless restrained, will continue to aid and abet violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### SEVENTH CLAIM FOR RELIEF

### Controlling Person Liability for Violations of the Exchange Act

### (Against Defendants Chen and Ye)

204.    The SEC realleges and incorporates by reference paragraphs 1 through 176 and paragraphs 188 through 203 above.

205.    When the Law Offices violated Sections 15(a) and 10(b) of the Exchange Act [15 U.S.C. § 78o(a) and 15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], as stated in the Third and Fifth Claims for Relief, and when the Law Offices aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as stated in the Fourth Claim for Relief, Chen directly or indirectly controlled the Law Offices.

206.    Chen cannot establish that she did not directly or indirectly induce the acts constituting the Law Offices' violations of Sections 15(a) and 10(b) of the Exchange Act [15 U.S.C.

§ 78o(a) and 15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], or the Law Offices' aiding and abetting of violations, and cannot establish that she acted in good faith.

207.   Chen is therefore jointly and severally liable pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with and to the same extent as the Law Offices for its violations as stated in the Third, Fourth and Fifth Claims for Relief.

208.   When Golden State violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], as stated in the Third Claim for Relief, Chen and Ye directly or indirectly controlled Golden State.

209.   Chen and Ye cannot establish that they did not directly or indirectly induce the acts constituting Golden State's violation of  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], nor that they acted in good faith.

210.   Chen and Ye are therefore jointly and severally liable pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with and to the same extent as Golden State for its violations as stated in the Third Claim for Relief.

211.   Unless enjoined, Chen will again engage in conduct that would render her liable, under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].  Unless enjoined, Chen and Ye will each again engage in conduct that would render them liable, under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**EIGHTH CLAIM FOR RELIEF**

**Alternative Liability for Disgorgement as a Relief Defendant**

**(Against Defendant Kuansheng Chen)**

212.   The SEC realleges and incorporates by reference paragraphs 1 through 176 above.

213.   As stated in the Second, Fourth and Sixth Claims for Relief, the SEC alleges that Kuansheng Chen is liable for aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 15(a) and 10(b) of the Exchange Act [15 U.S.C. § 78o(a) and 15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  However, to any extent that

Kuansheng Chen is not found liable for the violations alleged in the Second, Fourth and Sixth Claims, Kuansheng Chen alternatively is named in this Complaint as a relief defendant.

214.    Kuansheng Chen received, directly or indirectly, funds or other property from one or more of the other defendants or from investors, which are either the proceeds of, or are traceable to the proceeds of, unlawful activities alleged in this Complaint to which he has no legitimate claim.

215.    By reason of the foregoing, it would be inequitable for Kuansheng Chen to retain the proceeds from violations of the federal securities laws and such proceeds should be disgorged.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue orders permanently restraining and enjoining:

Defendant Chen from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. § 78j(b) and 15 U.S.C. § 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and from aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

Defendant Ye from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. § 78j(b) and 15 U.S.C. § 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and from aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

Defendant Robinson from aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

Defendant Kuansheng Chen from aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. § 78j(b) and 15 U.S.C. § 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

Defendant Law Offices from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. § 78j(b) and 15 U.S.C. § 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and from aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

Defendant Tree Lined from aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

Defendant Golden State from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Order Defendants (including Kuansheng Chen as a defendant or, alternatively, as a relief defendant) to disgorge all ill-gotten gains as a result of the violations alleged herein, together with prejudgment interest thereon, and to repatriate any funds or assets they caused to be sent overseas.

## IV.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.

Grant such other and further relief as may be just and necessary, including, as may be warranted, appointing a receiver over Golden State.

Dated:  February 10, 2022     Respectfully submitted,


        /s/ Kenneth W. Donnelly
        Kenneth W. Donnelly
        D. Ashley Dolan
        Heather A. Powell
        Sarah M. Hall

        Attorneys for Plaintiff
        Securities and Exchange Commission


## CERTIFICATE OF SERVICE

I certify that on February 10, 2022, I caused the foregoing to be filed via the Court's ECF system and thereby provided service to all parties.

        /s/ Kenneth W. Donnelly
        Kenneth W. Donnelly